## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CHICHESTER SCHOOL DISTRICT         :         Civ. No. _____

     Plaintiffs,                                    :
     v.                                                    :
CASA EDUCATION DECISION MAKERS,  :         Hon. _____

o/b/o Y.C.Q., a minor,                               :

     Defendant                                      :

---

## COMPLAINT

### PRELIMINARY STATEMENT

Pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. Section 1415 (i)(2), the Chichester School District  ("Chichester" or "District"), files this Complaint seeking  review of ODR Decision No. 29972-24-25, an April 14, 2025 Decision and Order of a Pennsylvania Special Education Hearing Officer awarding the CASA's  Educational Decision Makers to Y.C.Q. (a foster child attending the Chichester School District who had previously attended Wissahickon School District and had no formal education until ninth grade), compensatory education, a finding of IDEA eligibility, and an order to convene an IEP team meeting to program for Y.C.Q., based upon partial findings located in a parent expert report.

The District is pursuing this appeal as the Opinion and Order as entered by Hearing Officer Cathy A. Skidmore, Esquire in the above referenced matter is inconsistent with the evidence presented at the hearing and improper standards of law applied. All of these factors alone support the District's sought relief of partially vacating of this Hearing Officer Order. However, when examined in totality, most certainly support the District's request for relief.

## I.      JURISDICTION AND VENUE

1.   This Court has jurisdiction pursuant to 20 U.S.C. 1400 *et seq.* Jurisdiction is further

     predicated upon 28 U.S.C. Section 1331, this being an action arising under the laws of the

     United States.

2.   This matter was heard before a Special Education Hearing Officer who issued a final

     Decision and Order; therefore, administrative remedies have been exhausted. 20 U.S.C.

     1415(i).

3.   The Order of the Hearing Officer is dated April 14, 2025, and this matter was timely filed.

4.   Venue is proper under 28 U.S.C. 1391(b) as all pertinent events occurred in the Eastern

     District of Pennsylvania.

## II.     PARTIES

5.   Y.C.Q. has attended the Chichester School District since April 12, 2023.

6.   Y.C.Q.  was placed in the District by the Philadelphia County Court Family Division,

     pursuant to an order directing the Philadelphia Department of Human Services (DHS) to

     move the student to a foster home in the Chichester School District for enrollment. Attached

     as Exhibit 2 is the DHS enrollment application filed with the Chichester School District.

7.   The District does not dispute Y.C.Q.'s ability to attend Chichester School District at this

     time.

8.   Y.C.Q. is a ward of the Commonwealth of Pennsylvania, who is placed in a foster home and

     has Defendant, CASA and their Educational Decision Makers ("EDMs"), who are  the

     simulation of parental decision-makers responsible for the educational welfare of the 17 year

     old foster student Y.C.Q. and authorized to make decisions regarding Y.C.Q.'s education,

     including filing for due process and seeking IDEA services.

9.  Plaintiff, Chichester School District is a public school district and maintains its offices at 401 Cherry Tree Rd, Aston, Pa 19014. It is a recipient of federal funds and considered a Local Educational Agency ("LEA") under the IDEA.

10.  Defendants, Educational Decision Makers brought the initial action in this matter on behalf of the child, Y.C.Q.

### III.    STANDARD OF REVIEW

11. The IDEA permits "any party aggrieved by the findings and decision" to "bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy."  20 U.S.C. § 1415 (e)(2).  In such an action, the court (i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.  20 U.S.C. § 1415(i)(2)(C).

12. When reviewing IDEA cases, District Courts conduct a modified *de novo* review. *S.H. v. State-Operated Sch. Dist. of Newark*, 336 F.3d 260, 270 (3d Cir. 2003); See also *Mary Courtney T. v. Sch. Dist.,* 575 F.3d 235 (3d Cir. Pa. 2009) (noting "[w]e require a district court to apply a nontraditional standard of review when considering an appeal from a state administrative decision under IDEA.") *Id.* at 241.

13. Under the modified *de novo* standard of review, the "district court must give 'due weight' to the administrative record and must consider factual findings from the administrative proceedings 'prima facie correct.' " *Jack J. v. Coatesville Area Sch. Dist*., 2018 WL 3397552,

3

*6 (E.D. Pa. July 12, 2018) (citing *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 269 (3d Cir. 2012)).

14. Therefore, "[a] district court reviewing an administrative fact-finder's conclusions must defer to such factual findings unless the court identifies contrary non-testimonial evidence in the record or explains that the record read in its entirety compels a different conclusion." *Braden O. v. W. Chester Area Sch. Dist.*, 2017 WL 2869397, at *4 (E.D. Pa. July 5, 2017).

15. The Hearing Officer's legal conclusions, however, are subject to plenary review. *Braden O.*, 2017 WL 2869397, at 4 (citing *S.H.*, 336 F.3d at 271.)

16. When a hearing officer exceeds the scope of their authority or materially prejudices a party through improper post-decision conduct, the reviewing court applies an **abuse of discretion standard**.

17. An abuse of discretion occurs when a hearing officer's decision is arbitrary, capricious, made without proper legal foundation, or based on clearly erroneous factual findings. It also includes instances where the hearing officer acts beyond the authority conferred by statute or regulation. See *Oddi v. Ford Motor Co.*, 234 F.3d 136, 146 (3d Cir. 2000) ("An abuse of discretion exists where the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact."); see also *Gonzalez v. Puerto Rico Dep't of Educ.*, 254 F. Supp. 3d 219, 228 (D.P.R. 2017).

## IV.    LEGAL AUTHORITY

18. A parent (or EDM) is permitted to request to seek due process against a District if they disagree with placement, programming, progress, or believe there is a denial to provide their child with a Free Appropriate Public Education ("FAPE")

19. In determining whether a school district has complied with its obligations under the
    Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq., the inquiry
    must focus on two core elements: (1) whether the district has complied with the procedures
    set forth in the statute, and (2) whether the individualized education program ("IEP")
    developed through those procedures was reasonably calculated to enable the child to make
    progress appropriate in light of the child's circumstances. *Endrew F. v. Douglas Cnty. Sch.
    Dist. RE-1*, 580 U.S. 386, 399 (2017). Moreover, procedural violations rise to the level of a
    denial of FAPE only when they (1) impede the child's right to FAPE, (2) significantly
    impede the parent's opportunity to participate in the decision-making process, or (3) cause a
    deprivation of educational benefits. 20 U.S.C. § 1415(f)(3)(E)(ii).

20. Under Child Find obligations, school districts are required to identify, locate, and evaluate all
    children with disabilities residing within their jurisdiction who may be in need of special
    education and related services. 34 C.F.R. § 300.111(a). However, eligibility under IDEA
    requires more than the presence of a medical or psychological diagnosis. A student must
    have one or more of the enumerated disabilities under IDEA **and** require specially designed
    instruction as a result. 34 C.F.R. § 300.8(a)(1); *D.K. v. Abington Sch. Dist.*, 696 F.3d 233,
    249 (3d Cir. 2012).

21. Evaluations under IDEA must be comprehensive and meet several specific requirements.
    They must (1) use a variety of assessment tools and strategies, (2) avoid any single measure
    or assessment as the sole criterion for determining eligibility, and (3) be administered in the
    child's native language or mode of communication by trained and knowledgeable personnel.
    34 C.F.R. § 300.304(b)-(c). Furthermore, evaluations must not be discriminatory and must
    yield information relevant to educational programming. 34 C.F.R. § 300.304(c)(1)-(6).

22. In evaluating a district's delivery of a Free Appropriate Public Education ("FAPE"), the Third Circuit has emphasized that the law does not require schools to "maximize" a student's potential but rather to provide a program reasonably calculated to enable meaningful educational benefit. *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 269 (3d Cir. 2012); *Rowley*, 458 U.S. at 206–07. While the District denies that compensatory education is warranted, in the event that  the Hearing Officer awards compensatory education, it should be calculated on a "made whole" basis rather than an hour-by-hour basis because there has been no pervasive loss of educational benefit to the student. *See G.L. v. Ligonier Valley Sch. Dist.*, 802 F.3d 601 (3d Cir. 2015); see also *Jana K. v. Annville-Cleona Sch. Dist.*, 39 F.Supp. 3d 584, 610 (M.D. Pa. 2014).

23. When undertaking the analysis of whether compensatory education is permissible, a Hearing Officer "may award it to whatever extent necessary to make up for the **child's lost progress** and to restore the child to the educational path he or she would have traveled but for the deprivation." *G.L.* at  625 (emphasis added). The burden of proof in a due process hearing generally lies with the party seeking relief. *Schaffer v. Weast*, 546 U.S. 49, 62 (2005).

24. In the instant case, the EDMs filed a counterclaim and bear the burden of proving that the District's evaluations were not legally sufficient and that a denial of FAPE occurred. On the basis of that review, and input from the child's parents, identify what additional data, if any, are needed to determine whether the child has a disability; the educational needs of the child; present levels of academic achievement and related developmental needs; and whether the child needs special education and related services. 34 C.F.R. 300.305 (a)(2).

25. After completing the initial evaluation, to determine eligibility, a group of qualified

professionals and the parent of the child determine whether the child is a child with a

disability, as defined in 300.8, and the educational needs of the child. 34 C.F.R. 300.306 (a).

## V.    BACKGROUND

26. Y.C.Q. is a seventeen-year-old student that immigrated to the United States from Guatemala.

The date of her arrival in the U.S. is unknown.

27. Y.C.Q. previously did not attend any school in Guatemala. Moreover, records regarding

schooling in United States are spotty at best. Y.C.Q.  had some very sporadic attendance

while in New Jersey for a very brief time.

28. Y.C.Q. was placed in a program group home in the Wissahickon School District and in

September of 2022, is when and where she finally began receiving frequent and regular

schooling/education.

29. According to records which were not discovered by the District until well into litigation,

Y.C.Q. was diagnosed with several emotional disorders. These documents in the possession

of the EDMS as well as the Philadelphia County DHS and Community Umbrella Agency

( CUA), Bethanna, were never provided to the District. These documents were not provided

to the District for consideration during their examination and evaluation of the Student.

Moreover, during the course of this due process hearing, the District sought these documents

via subpoena and motion practice and the Hearing Officer denied the District access to them.

30. Y.C.Q. was first evaluated for IDEA eligibility by the Wissahickon School District, where

Y.C.Q. was determined to be ineligible for special education services.  The Wissahickon

School District  by application of the required determinant factors under IDEA  found that

due to  the  inability to rule out Y.C.Q.'s lack of exposure to any real education from

kindergarten up until 9th grade, and Y.CQ.'s lack of English proficiency and status as an English as a Second Language Learner were the contributing factors to any academic struggles and therefore ineligible for classification under IDEA for special education services.

31. Y.C.Q. moved to the Chichester School District in April of 2023, via a new foster home ordered by the Philadelphia Court.

32. The EDMs requested another evaluation be completed by Chichester School District on May 31, 2023. The EDMS never complained to Wissahickon School District about the Wissahickon evaluation but expressed to the Chichester District they did not agree with the prior report which found the student ineligible as a student with a disability under IDEA.

33. On June 5, 2023, the District issued a Notice of Recommended Educational Placement ("NOREP") denying the request for the evaluation after review of the Wissahickon report, which was completed mere months earlier.

34. The EDM again requested an evaluation by the District in the 2023-2024 school year. This request was granted by the District.

35. The District, similarly, to Wissahickon, denied eligibility due to lack of being unable to rule out whether Y.C.Q.'s struggles were a result of no prior formal education and lack of English proficiency.

36. The EDMs, again unsatisfied with this result, requested an IEE, resulting in the first portion of this litigation.

37. The District filed a due process request as required by law, after denying the request for an IEE.

38. There were disputes regarding witnesses and Parent experts as part of this initial filing.

39. The District withdrew its due process request and refiled with a motion to recuse Hearing Officer Skidmore to eliminate concerns and appearance of bias.

40. ODR assigned Hearing Officer Skidmore to oversee the entirety of the matter.

41. The District refiled its denial of the IEE request, which resulted in a December 9, 2024 Order, which has since been subject to federal review. The District believes this portion of the complaint is now resolved, as the Honorable Judge Kelley B. Hodge issued an Order finding that the December 9, 2024 decision was final.

42. The District was compelled to file a motion for leave to appeal out of time with this Honorable Court due to the issuance of a memorandum by the Hearing Officer after she had formally relinquished jurisdiction. This memorandum purported to clarify her December 9, 2024 Order, creating confusion and prompting the District to pause its efforts to comply with that Order. Judge Kelley B. Hodge's June 27, 2025 Order—issued after the Hearing Officer's subsequent April 14, 2025, decision in the matter now on appeal—makes clear that the District was in compliance with the December 9, 2024 Order. Nevertheless, the District is required to appeal the April 14, 2025 Order, because it contains findings and directives with which the District disagrees and inherently conflicts with, or undermines, the application of Judge Hodge's June 27, 2025 ruling, in addition to being fatally flawed.

43. The EDM, in response to the complaint the District was legally obligated to file as part of denying the IEE request, filed a counterclaim complaint. Prior to the procedural confusion stemming from the Hearing Officer's post-jurisdiction memorandum—and the District's need to seek judicial clarification—we will now turn back to the underlying due process proceedings that evolved. As required under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1415(b)(3) and 34 C.F.R. § 300.502(b)(2), the District timely filed a due

process complaint after denying the Educational Decision Makers' (EDMs') request for a publicly funded Independent Educational Evaluation (IEE). This complaint was mandated by law and appropriately limited to the narrow issue of whether the District's evaluation met IDEA standards.

44. Rather than responding to the IEE-specific issue raised in the District's complaint—as contemplated by IDEA's procedural safeguards under 34 C.F.R. §§ 300.507 and 300.508— the EDMs impermissibly expanded the proceeding by filing a broad counterclaim. That counterclaim raised multiple substantive and procedural allegations unrelated to the IEE denial, thereby transforming the nature of the hearing and circumventing IDEA's procedural safeguards, including notice requirements and the obligation to file separate complaints for distinct claims. See *Letter to Zirkel*, 56 IDELR 140 (OSEP 2011) (noting that IDEA due process procedures do not contemplate counterclaims and that all claims must be properly noticed and adjudicated within the framework of an individual complaint). As a result, the hearing was bifurcated to avoid conflating the two proceedings. The District now appeals from the portion of the decision resolving the EDMs' counterclaim.

45. The counterclaim complaint arose from the EDMs disagreement with two comprehensive evaluations, one by Wissahickon School District and one by the Chichester School District. Both evaluations concluded that Y.C.Q. did not qualify for special education services or eligibility under the IDEA.

46. Hearing Officer Skidmore oversaw both portions of the dispute.

47. Hearing Officer Skidmore issued her final order in the counterclaim matter on April 14, 2025.

48. As part of the counterclaim matter, Hearing Officer Skidmore incorporated the entirety of the record from Due Process Hearing 1 (ODR No. 29928-2425 KE). Therefore, the evidence and documents which were presented in Due Process Hearing 1 ("DP 1") are fully incorporated and set forth in Due Process Hearing 2 ("DP 2") which is the underlying proceeding subject of this appeal.

49. The Findings of Fact from DP 1 were fully incorporated into the final decision of DP 2 (this appeal), including citations to records. *See* Exhibit A at 4.

50. Therefore, it is nearly impossible to review DP 2 in a vacuum and DP 1 must be, at least partially, be considered.

51. In the counterclaim, the EDM sought a finding that the District denied Y.C.Q. FAPE and discriminated against her by (1) violating the District's child find obligation by failing to identify and evaluate her to determine eligibility from May 31, 2023 to present; (2) failing to timely respond to the EDM request for an evaluation; (3) failing to timely and appropriate evaluate her in all areas of need; and (4) failing to appropriately determine her eligible for special education related services.

52. The EDM sought a remedy of (1) a finding that Y.C.Q. be eligible for special education as a student with a disability; (2) create an IEP to address her needs; and (3) provide compensatory education. The EDM further requested reimbursement for reasonable attorneys' fees.

53. The following issues were presented to the Hearing Officer for determination:

    a. Whether the District's determination that Student was and is not eligible for special education under the IDEA and disabled pursuant to Section 504 was erroneous and violated its child find obligation?;

b.  Whether the District denied Student a free appropriate public education ("FAPE") at any time over the 2023-2024 and 2024-2025 school years on procedural and/or substantive grounds?;

c.  If the District has denied the student a FAPE in any respect, should the Student be awarded compensatory education?;

d.  If the District's eligibility determination is erroneous, should it be ordered to convene a team meeting to develop an Individualized Education Program ("IEP") appropriate for Student?

54. The Hearing Officer Ordered the following relief:

a.  The District denied Student FAPE on substantive grounds beginning February 28, 2025;

b.  The District did not deny Student an appropriate education on procedural grounds over the time period at issue;

c.  Student is awarded compensatory education in the amount of one hour for each day that school was in session in the District, beginning March 3, 2024 until such time as an IEP is developed and approved for immediate implementation.;

d.  The District is directed to convene a meeting of an IEP team for purposes of recognizing Student's emotional disturbance disability and developing a program to address all of Student's needs. The team members must consider the manifestations of that disability in the school environment and provide specially designed instruction and related services responsive to those identified needs. The IEP shall include, at a minimum, the following: counseling as a related service; direct instruction on coping, self-advocacy, and other self-regulation skills; and base foundational mathematics

instruction as part of its response to Student's anxiety relating to school work .The team shall also consider whether additional services for further development of English language proficiency is appropriate as well. As part of the program decisions, the team shall determine whether extended services such as extended day or extended school year programming may be provided in meeting all of these needs.

## VI.    ARGUMENT

### A.  Overview

55. The District disagrees with the Hearing Officer's finding that the District denied the Student a substantial FAPE beginning on February 28, 2025. The District asserts that the facts and evidence presented do not support this finding.

56. The District disagrees with both the compensatory education being awarded, as well as the amount. It is nearly impossible to decipher from the decision how Hearing Officer Skidmore determined the amount of compensatory education. The District asserts that the facts and evidence presented do not support this finding.

57. The District disagrees with the Hearing Officer's broad adoption of the Parent Expert Report by Dr. Kachmar. Moreover, the District disagrees with the Hearing Officer's selective use of the Parent Expert Report's findings. The District further asserts that the facts and evidence presented do not support this finding.

### B.  Expert Report

58. The Parent Expert Report was rebranded as an Independent Educational Evaluation ("IEE") during the course of this hearing.

59. The issue of whether an IEE should be granted was decided in DP 1. However, all facts and evidence presented in DP 1 were regurgitated and readopted in DP 2, the subject of this appeal.

60. The Hearing Officer relied solely and entirely on the IEE/Expert Report in making determinations regarding this matter, however, the report itself is inherently flawed and does not meet IDEA criteria.

61. The Hearing Officer relied on the IEE/Expert Report in determining whether Y.C.Q. qualified for special education services under the IDEA. The Hearing Officer further relied on the IEE/Expert Report in determining what services Y.C.Q. should be eligible for.

62. The Report is fundamentally flawed for several reasons. The Report is materially deficient and fails to meet accepted professional and legal standards in several critical respects.

63. Immediately and most importantly, the administration of the assessments must be questioned. The Parent Expert Report administrator, Dr. Kachmar, did not use interpreters who were knowledgeable in the administration of these assessments.

64. Additionally, at least one of the interpreters used testified that he had no background in psychological testing, received no instructions or preparation from Dr. Kachmar, and had never interpreted for a psychoeducational evaluation prior to the day of Y.C.Q.'s testing.

65. The other interpreter utilized for the assessments answered sworn interrogatories. In these interrogatories, she swears that she has no relevant experience, no certification, and varied the language during testing rather than following the standardized protocol.

66. An essential element under the IDEA to determining whether an evaluation is valid is whether the assessments were administered in accordance with the publishers' instructions to ensure standardization and validity.

67. Even further, these practices further directly violate 34 C.F.R. § 300.304(c)(1)(iv), which requires that tests be administered by "trained and knowledgeable personnel. Despite being a member of the National Association of School Psychologists (NASP), Dr. Kachmar failed to follow NASP's published guidance requiring that interpreters involved in psychoeducational assessments be specifically trained in test administration and terminology and be thoroughly briefed prior to testing.

68. This failure is inconsistent with federal requirements under the Individuals with Disabilities Education Act (IDEA), which mandates that assessments be administered by "trained and knowledgeable personnel." Pennsylvania law similarly requires that evaluation tools and materials be administered in accordance with the publishers' instructions and by individuals appropriately trained to do so. Dr. Kachmar's failure to ensure the use of a qualified interpreter undermines the validity of the assessment results and renders his conclusions unreliable under both federal and Pennsylvania special education standards. See 34 C.F.R. § 300.304(c)(1)(iv); NASP, *Best Practices in School Psychology* (2020 ed.), recommending interpreters be "specially trained and supervised" and briefed in testing procedures and terminology. See 22 Pa. Code § 14.105; see also Pennsylvania Department of Education, *Special Education Evaluation Guidance* (referencing IDEA § 614(b)(2)(C) and (3)(A)(ii)). *See* Exhibit C.

69. The evidence shows that Dr. Kachmar did not follow guidance issued by the National Association of School Psychologists.

70.  The evidence further shows that Dr. Kachmar had not met the interpreters before the testing sessions. He provided no training on the assessments and he failed to brief the interpreters on testing procedures.

71.  Here, testimony and report by the interpreters themselves bring doubt as to the validity and standardization of the testing. The evaluation further omits a key foundational component: an assessment of YCQ's language proficiency. The evaluation also fails to include a critical component required for validity: a thorough assessment of Y.C.Q.'s language proficiency. As an English Language Learner (ELL), Y.C.Q.'s level of English language acquisition is a foundational variable that must be considered in any psychoeducational evaluation to ensure results are valid and not confounded by language barriers (see *Dear Colleague Letter: English Learner Students and Limited English Proficient Parents*, U.S. Department of Education, Jan. 7, 2015).

72. Without understanding her English Language Learner (ELL) status and how it may affect test performance, any interpretation of academic or emotional functioning is, by definition, incomplete, flawed, and potentially misleading. This failure alone renders the report deficient under 34 C.F.R. § 300.304(b)(1), which requires that evaluations gather functional, developmental, and academic information about the child.

73. Dr. Kachmar further mischaracterized District rating scales.

74. Dr. Kachmar's conclusions about elevated anxiety and depression were squarely contradicted by both the teacher testimony and the testimony of school psychologist Ricco.

75. Moreover, educators who had filled out the rating scales had made it clear that their ratings regarding Y.C.Q.'s social difficulties was not indicative of emotional disturbance. Rather, they consistently attributed the challenge to a language barrier—not any underlying emotional or psychological issue.

76. Despite it being standard procedure to follow up with staff to contextualize their rating scales, no follow up took place here by Dr. Kachmar

77. Additionally, Dr. Kachmar attempted to find Y.C.Q. eligible for special education under the classification of a Specific Learning Disability in math.

78. Dr. Kachmar relied heavily—and improperly—on a perceived discrepancy between YCQ's cognitive scores and her math achievement scores without adequately accounting for critical contextual factors, such as her interrupted education and ongoing English language development.

79. These factors must be considered when interpreting standardized assessments to ensure compliance with the Individuals with Disabilities Education Act's (IDEA) requirement that evaluations be nondiscriminatory and tailored to the student's background and language proficiency. See 34 C.F.R. § 300.304(c)(1)(ii)–(iv) (requiring that assessments be "provided and administered in the language and form most likely to yield accurate information," and be administered by "trained and knowledgeable personnel" using "technically sound instruments"); see also 22 Pa. Code § 14.105 and 22 Pa. Code § 4.52(g).

80. Specifically, Dr. Kachmar highlighted a discrepancy between YCQ's performance on the Geometric Scale of the CTONI-2 (Comprehensive Test of Nonverbal Intelligence – Second Edition) and her math calculation scores, claiming that the gap constituted a severe discrepancy. He asserted that this disparity constituted a "severe discrepancy," thereby justifying a Specific Learning Disability classification.

81. However, the use of the severe discrepancy model is not required under IDEA and has been disfavored by many jurisdictions and professional organizations due to its susceptibility to misinterpretation in culturally and linguistically diverse populations. See *IDEA*, 20 U.S.C. § 1414(b)(6) (permitting but not requiring the use of a severe discrepancy model); *OSEP Letter to Zirkel*, 110 LRP 27033 (June 2, 2010) (emphasizing that the severe discrepancy model is

not mandated and may be replaced by alternative models such as Response to Intervention (RTI) or patterns of strengths and weaknesses analysis); see also Pennsylvania Department of Education (PDE), *Annotated IEP Form Guidance* (recommending multiple data sources when determining eligibility for SLD).

82. Even further, the Geometric Scale measures visual-spatial reasoning—not mathematical aptitude. A high score on this subtest does not translate into generalized cognitive ability, nor does it justify using that score as the benchmark against which to measure all areas of academic functioning.

83. Dr. Kachmar's use of this isolated subtest to anchor a severe discrepancy analysis lacks technical validity and fails to align with IDEA's requirement for comprehensive, reliable, and valid assessments. National Association of School Psychologists (NASP), *Best Practices in Cognitive Assessment of Culturally and Linguistically Diverse Students* (2020) (warning against misuse of nonverbal subtests as proxies for general intelligence); see also 34 C.F.R. § 300.304(b)(2), (c)(6) (evaluation must assess "all areas of suspected disability" and not rely on "any single measure or assessment s as the sole criterion. Moreover, the IDEA does not permit identification of SLD based solely on a cognitive-achievement discrepancy, particularly one derived from a single subtest.

84. Rather than conducting a comprehensive analysis of YCQ's instructional history, academic progress, and access to interventions, Dr. Kachmar defaulted to an outdated and disfavored ability-achievement discrepancy model. However, his logic does not apply to all areas where Y.C.Q. had a severe discrepancy. Dr. Kachmar failed to explain this discrepancy in the application of standards when making determinations of eligibility.

85. Moreover, the report contained information that was withheld from the District, ensuring that the IEE would inevitably be considered more comprehensive than the District report.

86. While these reports were not shared with the District, they were shared with Dr. Kachmar, the IEE/Parent Expert evaluator.

87. The Parent Expert Report / IEE report cannot be used as a basis for determining whether Y.C.Q. is eligible for special education, nor should it be used to determine what services she qualifies for.

88. Moreover, the Hearing Officer selected portions of the report which she agreed with and ignored those which she did not. It is unclear to this District how this report is valid for purposes of educational planning, yet not valid to adopt all findings.

89. Even further, the Order, as presented by Hearing Officer Skidmore, provides for mathematics support. Yet, Hearing Officer Skidmore openly admits that Y.C.Q. does not qualify as a student with a specific learning disability in mathematics, basing the support solely on the finding of Emotional Disturbance. Moreover, the Order issued by Hearing Officer Skidmore directs the provision of mathematics support, despite her express finding that Y.C.Q. does not qualify as a student with a Specific Learning Disability in mathematics. The Hearing Officer appears to base this academic support solely on the Emotional Disturbance classification, a rationale that is not supported by the evidentiary record or consistent with IDEA eligibility criteria.

90. The Hearing Officer, despite having not adopted the finding of a specific learning disability in math, still attempted to program for Math support under the guise of emotional disturbance. The Hearing Officer, while expressly rejecting a finding of Specific Learning Disability in mathematics, nevertheless attempted to mandate math-related programming by

attributing academic deficits to the Emotional Disturbance classification. This approach improperly conflates distinct eligibility criteria and lacks support in the record.

91. The report itself is unreliable, based on broad misconceptions of data, lack of follow through, and failure to follow protocol. In short, if this was a District based report, it would most certainly be found inadequate. The report is fundamentally unreliable, reflecting significant misinterpretations of assessment data, insufficient follow-through, and a failure to adhere to established evaluation protocols. If this were a District-issued evaluation, it would almost certainly be deemed legally and procedurally inadequate under IDEA standards.

92. Therefore, the report must be found to be invalid and unreliable. Any reliance on the report should result in the vacating of those findings and orders. Accordingly, the report should be deemed both invalid and unreliable. Any findings or orders derived from or dependent upon this report must be vacated, as they rest on a fundamentally flawed and procedurally deficient foundation.

### C. Compensatory Education

93. "The FAPE analysis for compensatory education is not backward-looking, courts must look at a school district's actions during the period of the alleged deprivation." *Mary T. v. Sch. Dist. of Philadelphia*, 575 F.3d 235, 251 (3d Cir. 2009).

94. Moreover, a proper assessment of whether a proposed IEP meets the established standards must be based on information "as of the time it was made." *D.S. v. Bayonne Board of Education*, 602 F.3d 553, 564-65 (3d Cir. 2010); see also *Fuhrmann v. East Hanover Board of Education*, 993 F.2d 1031, 1040 (3d Cir. 1993)(same).

95. Under the IDEA, compensatory education is an equitable remedy designed to address a denial of FAPE by placing the student in the position he or she would have been in but for the violation. *See Ferren C. v. Sch. Dist. of Phila.*, 612 F.3d 712, 718 (3d Cir. 2010).

96. Y.C.Q. was appropriately found ineligible for special education. Thus, she required no IEP. However, the District consistently provided her with supports to help enable her to make progress.

97. These supports, despite having no duty to do so, aligned with FAPE standards.  The District's record of support for YCQ is clear and compelling.

98. The District offered a reduction in homework to alleviate EDM-reported concerns. The District also ensured Y.C.Q. was placed in a study skills classroom to assist her in both work completion and management. The District further provided individualized work for Y.C.Q., ensuring that she was able to participate in classes.

99. Y.C.Q. was provided with access to counseling with a bilingual social worker on staff at the District. Y.C.Q. was further programmed for as an English Language Learner.

100.   The District's diligent efforts to program for Y.C.Q., despite its firm belief that Y.C.Q. does not qualify for special education, does rise to the level of providing a FAPE, therefore negating any compensatory education owed. Compensatory education is available only where the District fails to provide FAPE. *D. F. v. Collingswood Borough Bd. Of Education*, 691 F.3d 488 (3rd Cir. 2012).

101.   There was no evidence presented regarding what educational benefit Y.C.Q. lost due to alleged inadequate programming for her disability. The record showed no regression, no absence of services, and no educational malfunction. In fact, many of the supports which were ordered were being provided, further cutting against any compensatory remedy.

102.    Moreover, the alleged lack of programming is focused on a diagnosis located in a Parent

Expert Report. This is nearly impossible to justifiably rely on when an IEE ordered by the

same Hearing Officer is still ongoing and part of a recently finalized decision by the

Honorable Judge Hodge. (See Exhibit B). The mere fact that the Hearing Officer ordered an

IEE and then relied upon a Parent Expert Report in making all other determinations in this

case, including determinations of services necessary for Y.C.Q.'s education, and by default

the amount of compensatory education owed. Inherently, this fatal flaw requires that the

findings in this Order be overturned.

103.    The basis for the compensatory education award is rooted in an alleged deficiency in

programming. This assertion based primarily on a diagnosis contained in a privately obtained

Parent Expert Report. This reliance is fundamentally flawed, as the Independent Educational

Evaluation (IEE) ordered by the same Hearing Officer is still ongoing and directly tied to a

recently finalized federal court decision by the Honorable Judge Kelley B. Hodge. (See

Exhibit B). Despite this, the Hearing Officer improperly relied on the Parent Expert Report to

make determinations regarding the services necessary for Y.C.Q., including the award of

compensatory education. The decision to disregard the IEE process ordered by the tribunal

itself, while relying instead on an unvetted private report, renders the Order legally unsound

and requires that it be reversed.

104.    Moreover, the Hearing Officer failed to utilize the "make whole" approach, rather than an

hour-by-hour analysis. The "make whole" should have been used as there was no pervasive

loss of educational benefit to Y.C.Q.  An award for compensatory education is a remedy only

for proven educational damage. There was no record of education loss or damage here. *See*

*G.L. v. Ligonier Valley Sch. Dist.*, 802 F.3d 601 (3d Cir. 2015); see also *Jana K. v. Annville-Cleona Sch. Dist.*, 39 F. Supp. 3d 584, 610 (M.D. Pa. 2014).

105.    Even further, when undertaking the analysis of whether compensatory education is permissible, a Hearing Officer "may award it to whatever extent necessary to make up for the child's lost progress and to restore the child to the educational path he or she would have traveled but for the deprivation." *G.L.* at 625. Here, the award was blatantly unnecessary.

106.    Despite using the hour-by-hour analysis, the District remains confused regarding how the Hearing Officer calculated the amount of compensatory education owed and the time period. **Even accepting the hour-by-hour framework, the District cannot determine how the Hearing Officer arrived at the amount or duration of compensatory education awarded. The decision lacks a clear explanation or citation to evidence in the record, rendering the award arbitrary and contrary to the standards set forth in 34 C.F.R. § 300.513(a), which require that findings be based on substantive violations of IDEA and supported by the hearing record,**

107.    Y.C.Q. consistently received individualized instruction and support, similar to what the Hearing Officer ordered in her decision. Y.C.Q. consistently received individualized instruction and academic support aligned with her educational needs—substantially mirroring the very supports the Hearing Officer later ordered in the decision.

108.    Under the make-whole analysis, Y.C.Q. suffered no pervasive loss of educational benefit. There is no evidence in the record that the District failed to program for the Student at any time.

109.   The award lacks analysis of actual loss of benefit or educational regression. *Reid v. District of Columbia*, 401 F.3d 516, 524 (D.C. Cir. 2005), rejected blanket awards without evidentiary basis.

110.   The student never received homebound instruction and attended school regularly. Without evidence of regression of missed services, the award lacks factual grounding.

## VII.    CONCLUSION

The District takes this appeal to protect its own legal rights as outlined in state and federal law as it pertains to the use of taxpayer dollars to resolve educational disputes between Local Education Agencies (LEAs) and Students/Families and to correct clear errors of fact and law made in the underlying proceedings of this case. The Hearing Officer erred in numerous ways, including improper determination, against the weight of substantial evidence, and improper application of law.

The District brings this appeal to protect its legal rights under applicable state and federal law, particularly as they relate to the appropriate and lawful use of taxpayer dollars in resolving disputes between Local Education Agencies (LEAs) and students or their families. The District a seeks to correct numerous clear and prejudicial errors of fact and law committed by the Hearing Officer during the underlying proceedings. Specifically, the Hearing Officer erred in the following material respects:

1. Erroneous Findings of Fact: The Hearing Officer made findings that were not supported by substantial evidence in the record, including reliance on uncorroborated and speculative testimony, mischaracterization of documentary evidence, and failure to credit credible testimony from District witnesses.

2. Misapplication of Legal Standards: The Hearing Officer applied incorrect legal standards under the Individuals with Disabilities Education Act (IDEA), particularly with respect to the District's child find responsibilities, eligibility determinations, and provision of a Free Appropriate Public Education (FAPE).

3. Improper Reliance on Unqualified Expert Opinion: The Hearing Officer gave undue weight to a report submitted by a Parent-retained expert whose conclusions were not based on valid, comprehensive assessment data, and failed to meet the legal requirements of an Independent Educational Evaluation (IEE).

4. Premature and Unsupported Findings Based on an Incomplete IEE Process: Although the Hearing Officer previously ordered an IEE to be completed, she nevertheless issued findings and ordered relief based on an expert report submitted by the Parent (EDMs), undermining the very purpose of the IEE process and violating procedural safeguards under IDEA.

5. Unsupported and Speculative Award of Compensatory Education: The compensatory education award was based on conjecture and an improper assumption of harm, rather than a demonstrated denial of FAPE supported by evidence of educational loss or unmet needs attributable to the District.

These errors, taken individually and collectively, render the Hearing Officer's Order legally and factually infirm. Accordingly, the District respectfully requests that the Order be reversed in its entirety or, in the alternative, dismissed as unsupported by the record and contrary to law.

## **RELIEF REQUESTED**

WHEREFORE, the District respectfully requests that this Court:

a. Review the administrative record in its entirety;

25

b.  Reverse the Hearing Officer's award in its entirety;

c.  Stay any responsibility of the District to pay for any such prevailing party attorneys' fees pending this Court's review and decision in this matter under these particular and troubling facts; and

d.  Grant any other such relief as the Court deems appropriate.

Respectfully submitted,

*/s/ Linell Lukesh*
Linell Lukesh, Esq.
Attorney ID#75412
Samantha L. Newell, Esq.
Attorney ID#329713
Attorneys for Chichester School District
Sereni Law Group, LLC
32 Regency Plaza
Glen Mills, PA 19342
linell@serenilawgroup.com
Samantha@serenilawgroup.com,